# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00401-CR

**Gordon Lee Currin, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT
### NO. CR22,329, HONORABLE ED MAGRE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Gordon Lee Currin was convicted of murdering Greg Storey.[1] *See* Tex. Penal Code Ann. § 19.02 (West 2003) (listing elements for murder). During the trial, Currin pleaded not guilty, but the jury found him guilty and imposed a life sentence. On appeal, Currin challenges the district court's decision to exclude evidence regarding violent acts allegedly committed by Greg. We will affirm the judgment of the district court.

## BACKGROUND

Three years before his death, Greg purchased property from Currin and agreed to make monthly payments directly to Currin. Greg lived on that property with his wife, Tammy Storey. In addition to the Storeys' home, there was another building located on the property,

---

[1] Due to the fact that several of the people involved in this case share identical last names, we will refer to those individuals by their first names.

which Greg had at one time rented out to John and Deborah Alexander. While they leased the property, the Alexanders ran a barbecue restaurant inside the building. However, shortly before Greg's murder, Greg evicted the Alexanders from the property.

Currin and Greg had an amicable relationship until Currin indicated that he wanted to discontinue their financial arrangement and wanted to sell either the property or the note on the property to someone else.[2] As the relationship deteriorated, Greg and Currin each contacted law-enforcement officials regarding threats allegedly made by the other. Several officials advised both Currin and Greg to stay away from one another.

Shortly after having a discussion with the police, Currin saw Greg sitting outside in front of the building that the Alexanders had used as a barbecue restaurant. At the time, Currin was riding in his truck with his friend, Rosalee Jones. As Currin drove by, he and Greg exchanged obscene gestures. After exchanging gestures with Greg, Currin then proceeded to Jones's home and dropped her off. Once Jones got out of the truck, Currin retrieved his shotgun from behind the seat, put the gun in the front of the car, and proceeded to Greg's property again. While driving by Greg's home for the second time, Currin and Greg again exchanged obscene gestures. In addition, Greg also yelled something at Currin. Around this time, Greg told his wife to go to their home and call the police. Eventually, Currin turned onto Greg's property and parked in a lot in front of the restaurant.

After Currin parked his truck, Greg moved quickly towards the truck. When he saw Greg moving towards the truck, Currin pulled his gun from the front floorboard and showed the gun

---

[2] One witness testified that Currin was planning on selling the property to the Alexanders.

to Greg. Once Greg saw the gun, he yelled, "gun," and then turned and ran back towards the building. As Greg was running away, Currin shot him in the back three times.

When Tammy heard the shots, she ran back to the restaurant and found her husband lying on the ground. She also saw Currin's truck leaving the parking lot. After shooting Greg, Currin drove to the sheriff's office and told an officer that he "just shot a fella," "shot the motherfucker," or "shot the son of a bitch."

Shortly after his arrival at the sheriff's station, Currin was arrested and questioned regarding the shooting. During the questioning, Currin stated that he shot Greg in self-defense and that Greg must have been running to get a weapon. The police searched the area where Greg's body was found, but they found no weapons in the area. Ultimately, a trial was held, and the jury found Currin guilty of murdering Greg and imposed a life sentence.

**DISCUSSION**

In one issue on appeal, Currin asserts that the district court abused its discretion by refusing to allow Currin to present evidence regarding violent acts allegedly committed by Greg prior to the shooting. *See Tate v. State*, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998) ("*Tate I*") (explaining that appellate courts review decision to exclude evidence for abuse of discretion). Specifically, Currin insists that the district court erred by preventing him from introducing evidence showing that Greg had threatened the Alexanders. After the court concluded that John and Deborah could not testify regarding threats Greg allegedly made against them, Currin made an offer of proof in which the Alexanders testified outside the presence of the jury regarding the events. The Alexanders both stated that a few weeks before Greg was killed, he came to their restaurant,

3

threatened them, and showed them a gun that he had under his shirt. Further, the Alexanders related that during the time of the eviction proceedings, Greg went to the restaurant again and told them that he would burn their house down and shoot them when they ran out of the house. On appeal, Currin insists that the district court's decision harmed him because it "denied him the opportunity to discredit the testimony by the State concerning the lack of weapons available to [Greg], as well as the opportunity to bolster [his] contention that he reasonably thought [Greg] was going for a weapon when he turned from the truck and ran towards the building."[3]

In general, evidence regarding a victim's character is not admissible "for the purpose of proving action in conformity therewith." Tex. R. Evid. 404(a). Similarly, evidence of other crimes or bad acts committed by a victim is not admissible simply to show character conformity. *Id.* R. 404(b); *see Torres v. State*, 117 S.W.3d 891, 895 (Tex. Crim. App. 2003). However, these general rules have several exceptions, including admitting evidence of a "pertinent character trait of the victim." *Id.*; *see Tate I*, 981 S.W.2d at 192. For murder cases, if a defendant raises the issue of self-defense, the defendant may "introduce evidence of the deceased's violent character" in order to demonstrate "the reasonableness of the defendant's fear of danger or to demonstrate that the deceased was the first aggressor." *Torres*, 117 S.W.3d at 895; *see Tate I*, 981 S.W.2d at 193 (explaining that rules of evidence allow for admission of evidence of prior bad acts for certain purposes). Evidence pertaining to whether the deceased was the first aggressor is admissible because it relates to "the deceased's intent, motive, or state of mind." *Torres*, 117 S.W.3d at 895; *see* Tex. R.

---

[3] We note that no evidence was introduced showing that Currin was aware of the threats allegedly made against the Alexanders prior to the shooting.

Evid. 404(b) (allowing evidence of violent acts by victim to be introduced as proof of motive, intent, plan, and other reasons). Because evidence addressing whether the victim was the first aggressor goes to the victim's state of mind, it is not necessary that the defendant know of the violent act or acts. *Torres*, 117 S.W.3d at 895. Before evidence of violent acts by the victim may properly be introduced, the defendant must show "some act of aggression that *tends* to raise the issue of self-defense, which the violent act may then help clarify." *See id.*

When arguing that the district court erred by excluding the evidence, Currin insists that a proper predicate had been laid prior to the Alexanders being called to testify. Specifically, Currin refers to testimony from several witnesses, including himself, describing various threats Greg allegedly made and to the portion of his testimony where he stated that Greg moved aggressively towards his truck before the shooting.

Even assuming that the district court erred by excluding the evidence sought, that error would not be grounds for reversal in this case. For criminal cases, there are two types of reversible errors: (1) constitutional errors, and (2) nonconstitutional errors that affect a substantial right. *See* Tex. R. App. P. 44.2. Incorrect evidentiary rulings only rarely rise to the level of constitutional error. *Williams v. State*, 191 S.W.3d 242, 257 (Tex. App.—Austin 2006, no pet.); *see also* Tex. R. App. P. 44.2(a) (outlining review of constitutional errors). The exclusion of defensive evidence is constitutional error only if the "evidence forms such a vital portion of the case that exclusion effectively precluded the defendant from presenting a defense." *Williams*, 191 S.W.3d at 257; *see Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002). In other words, if the defendant was not prevented from presenting the substance of his defense, the erroneous exclusion of evidence was not of a constitutional nature. *Potier*, 68 S.W.3d at 666.

5

No unconstitutional deprivation occurred in this case. Although Currin was not allowed to question the Alexanders in front of the jury regarding threats Greg allegedly made against them, Currin was able to present his defense. The jury was properly instructed regarding the law of self-defense and was told to acquit Currin if they determined that Currin "reasonably believed that the use of deadly force on his part was necessary to protect himself against . . . [Greg's] use or attempted use of unlawful deadly force." *See* Tex. Penal Code Ann. § 9.32(a)(2)(A) (West Supp. 2009) (listing circumstances in which use of deadly force is authorized). In his testimony, Currin also insisted that he never threatened Greg. Further, Currin asserted that he placed the gun in the front seat because he was going hunting later and that he only went to Greg's property to collect money from him.

Regarding the shooting, Currin claimed that Greg threatened to beat him when he drove by the property and that he only shot Greg after first hearing a gun shot. During the trial, Currin insisted that the shot was fired by a "sniper" from across the street. In addition, Currin testified that Greg aggressively advanced towards his truck before he pulled out the gun. Furthermore, Currin communicated his belief that Greg "had to be" or "might have been" going to get a gun when Greg ran back to the building.

In addition to Currin, several witnesses testified that they heard more than three gunshots. For example, John testified that he was in the general area when the shooting occurred and that he heard four shots. John also explained that one of the shots sounded different than the others, but he admitted that he did not tell the police about the fourth shot when they questioned him. Deborah agreed with her husband's testimony and stated that she heard four shots but that the first one was louder than the others. Similarly, Melissa Jackson testified that she lives about a block from

6

where the shooting occurred and that she heard the shots. However, when she described the shots, she stated that she initially heard "a small pop like it was either a small pistol or a firecracker, and then three loud booms."[4] Jackson admitted that she never told the police what she had heard.

Moreover, although the Alexanders did not testify in front of a jury about threats Greg allegedly made against them, other witnesses provided general testimony regarding the alleged threats. For example, Deputy Chris White testified that he had been called to the Storeys' property on more than one occasion due to disagreements between Greg and the Alexanders and agreed that the parties had threatened each other. Similarly, Constable Herbie Vaughan testified that he had witnessed a confrontation between Greg and the Alexanders.

In addition to testimony pertaining to these alleged threats, testimony was also presented describing other threatening behavior allegedly engaged in by Greg. For example, Deputy White testified that Currin and Greg had both threatened one another. Also, Currin's daughter, Diane Whiteley, testified that Currin had been preoccupied by "threats [Greg] was making against him." Officer Johnny Beathard testified that he had known Greg for years and admitted that Greg had a temper. Similarly, Sheriff David Greene stated that Greg has a reputation for being violent. Finally, Hollis Lewis, who was a former district attorney, and Delmon Cude, who was an inmate at the time of the trial, testified that Greg had a reputation for not being a peaceful person, that Greg was a bully, and that Greg was not a law-abiding citizen.

Beyond this general testimony, Currin testified regarding specific threats Greg allegedly made against him prior to the day of the shooting. In his testimony, Currin recalled that

_____

[4] Jackson testified that she has known Currin for over twelve years and has purchased eleven properties from him over the years.

Greg had threatened to beat him "into the ground," to "whoop" him, to shoot him, and to burn his house down.[5] In addition, Currin related that Greg once went to Currin's house with a "little old pistol" and that Tammy and Greg had threatened his life. Further, Currin testified that right after Greg threatened his life, he invited Greg to go hunting with him. When describing the hunting trip, Currin stated that he gave Greg a gun to use and that Greg later pointed the weapon at him and cocked the gun.

In light of the preceding, we cannot conclude that Currin was prevented from presenting the substance of his self-defense claims. Accordingly, assuming that the exclusion was erroneous, the error is nonconstitutional in nature and, therefore, must be disregarded unless it affected one of Currin's substantial rights. *See* Tex. R. App. P. 44.2(b); *see also Tate v. State*, 988 S.W.2d 887, 890 (Tex. App.—Austin 1999, pet. ref'd) ("*Tate II*") (explaining that ruling that results in "the erroneous exclusion of defensive evidence is nonconstitutional error if the trial court's ruling merely offends the rules of evidence"). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Tate II*, 988 S.W.2d at 890. In other words, the conviction should not be overturned if the reviewing court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Id.*

Even assuming that the jury would have believed the testimony from the Alexanders and assuming that their testimony would have supported Currin's self-defense claim, the exclusion of that evidence did not affect Currin's substantial rights. As described above, the jury was properly

---

[5] In his testimony, Currin stated that the threats did not bother him and that he was not scared of Greg.

8

instructed on the law of self-defense, and Currin was able to elicit testimony from various witnesses regarding threatening behavior allegedly committed by Greg prior to the shooting. Furthermore, the evidence presented at trial demonstrated that Currin drove by Greg's property, exchanged offensive hand gestures with Greg, moved his gun from his back seat to his front seat before driving back to Greg's property, exchanged obscene gestures with Greg again, parked on Greg's property, flashed his gun, shot Greg in the back three times when Greg attempted to run away from the gun, drove to the police station, and told the police that he had shot Greg. In his testimony, Currin also stated that he would not tolerate anyone yelling at him. In addition, Currin explained that his gun would have continued to shoot additional rounds if it had not jammed.

Moreover, evidence was also introduced showing that Currin had threatened to kill Greg shortly before Greg was shot. Specifically, Jones testified that on the day Greg died, she heard Currin tell John over the phone that "either you're going to get [Greg] or I'm going to get him; somebody is going to kill him."[6] In addition, Tammy testified that Currin told her that the only reason Greg was still alive was because Greg had a wife and children to take care of. During his testimony, Officer Beathard explained that a few days before the shooting, Currin asked, "what can I do, shoot [Greg]?"

In addition, although Currin testified that Greg may have been going for a gun, no evidence was introduced showing that Greg was armed or attempted to use deadly force. In fact, when the police searched the area in response to Currin's assertion that he thought Greg may have been going for a weapon, the police found no weapons in the area near where the shooting occurred.

---

[6] In their testimonies, John and Currin both denied that this exchange occurred.

Further, the three shot gun casings that were recovered from the scene and from Currin's truck had all been fired from Currin's gun.

Regarding the alleged sniper, none of the witnesses that were in the area when the shooting occurred or that responded to the scene reported seeing a sniper. Moreover, Currin admitted that he did not know who the sniper was shooting at. Also, although the Alexanders and Jackson testified that they heard four shots, Tammy testified that she only heard three shots. Similarly, Jennifer Juhl, who was driving by the Storeys' property when the shooting occurred, testified that she heard three shots fired.

Furthermore, when Currin drove to the sheriff's office and admitted that he shot Greg, he did not mention a sniper.[7] Instead, Currin stated that he drove to Greg's property to see what Greg had been yelling and that he blew Greg's "ass away" when Greg tried "to run in the house." During that same session with the police, he later stated that he shot Greg "flat as hell that's what I did." Currin's statement to the police was played to the jury. In addition to that recording, the State also played a recording of a conversation Currin had with Jones while he was at the police station. During that telephone exchange, Jones told Currin, "I heard you killed [Greg]," and Currin responded, "Well he knew he was going to get it."

The absence of any evidence showing that Greg used or was about to use deadly force against Currin prior to Currin displaying his gun and shooting Greg persuades us that any error that the district court may have committed by excluding the evidence in question did not have a substantial and injurious effect or influence on the jury's verdict. In light of the evidence in the

---

[7] In his statement, Currin did assert that he thought Greg was running from the truck to get a gun.

10

record, we have more than a fair assurance that the error did not influence the jury or had but a slight effect. Accordingly, we conclude that any error did not affect a substantial right and overrule Currin's issue on appeal.

## CONCLUSION

Having overruled Currin's sole issue on appeal, we affirm the judgment of the district court.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed: August 27, 2010

Do Not Publish

11